# IN THE COURT OF APPEALS OF IOWA

No. 16-1685
Filed December 21, 2016

**IN THE INTEREST OF M.M.,**
**Minor child,**

**STATE OF IOWA,**
        Appellant.
_____


        Appeal from the Iowa District Court for Polk County, Rachael E. Seymour,

District Associate Judge.


        The State appeals the juvenile court's modification of its disposition order

modifying the child's prior placement in foster care to placement with "other

suitable person[s]."  **AFFIRMED.**


        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellant State.

        Nicole Garbis Nolan of Youth Law Center, Des Moines, guardian ad litem

for minor child.


        Considered by Danilson, C.J., and Doyle and McDonald, JJ.

**DOYLE, Judge.**

The State seeks reversal of the juvenile court's modification of the disposition order that modified the child's prior placement in foster care to placement with "other suitable person[s]." The State argues the juvenile court should have placed the child back in the care of the child's relative who had previously cared for the child for a short time until asking that the child be placed in a two-parent foster home. Upon our de novo review, we affirm.

### I. Background Facts and Proceedings.

The circumstances leading to this appeal are distressing. On February 6, 2016, the mother of M.M., born in late 2014, left the child with his father, stating she would return the next day for M.M. She did not. Four months later, the father contacted the Iowa Department of Human Services (DHS) because he "did not care to keep the child." The father met with a DHS child protective worker the next day, gave the worker the mother's contact information, and left M.M. in the care of the DHS.

The worker contacted the mother and informed her of the situation. The mother was living in Minnesota and unable to come get the child. Ultimately, the mother named her cousin as a possible custodian for the child, and her cousin agreed to care for the child.

The cousin came to the DHS and met with the worker. The cousin explained to the worker that she worked nights and her own mother, M.M.'s maternal great-aunt (aunt), provided care for her own child while she worked. Both the cousin and the aunt were found to be suitable caregivers, and the child was placed in the cousin's care via an ex parte order for placement. The

placement was changed shortly thereafter to the aunt due to conflicts in the cousin's work schedule.

The child was adjudicated a child in need of assistance (CINA) in July 2016. By the time of the disposition hearing in August, the aunt had notified the DHS she was not going to be able to continue caring for M.M. The State filed a motion to modify the disposition to place the child in foster care. The motion explained:

> [The aunt] did let [the DHS] know that they would need to find a new placement for the child but that she would keep him until the end of August so that they could try to locate a new placement. . . . [The DHS] has sent relative notices out but no one has responded thus far. [The DHS] also gave mother the opportunity to provide her with the names of family friends two weeks ago and she did not provide [the DHS] with any names.
> . . . .
> [The DHS] is now seeking foster care placement since the child has to be out of the [aunt's] home by tomorrow. An initial visit was conducted with [M.M., the aunt,] and the foster parent. [The aunt] plans to continue to keep in contact with [the DHS] and [the child] so that she can continue to be a positive support in his life. The foster family is dually licensed and ready and willing to take [the child].

The State's motion was granted that day, and the court set the modification for further hearing on September 21, 2016.

At the September 21 modification hearing, the court learned the foster family had informed the DHS they were unwilling to continue to foster the child, due to the child's severe behavioral issues. The foster mother had written a letter asking the court to consider allowing the child to return to the care of his cousin and/or his aunt, stating:

> After caring for him for the past several weeks, I am certain that it is what would be best for him. I understand that services were ordered for him during the last hearing . . . and I believe that, with

the aid of those services, his own family will be far more successful in helping rehabilitate him than another family would.

We were given the opportunity to meet [the child] and provided with information about his behaviors and needs ahead of our agreeing to take him into our home. None of that prepared us for what it would be like to care for him adequately . . . . His family deeply cares about him. They have kept in contact with us over the duration of his stay in our home to make sure he is doing well, and have been a source that we have used when trying to determine how best to deal with certain issues of his behavior and care.

The State advised the court the DHS had not yet found another foster home for the child, and it and the DHS both recommended that the child be placed again with the cousin. The DHS worker explained:

[S]ince [the child has] been placed in foster care, he has had a lot of behavioral issues. He had a lot of those behavioral issues before. Obviously, it's evident that he was neglected throughout his young life and he needs a lot of services and support.

When [the aunt] gave notice at the beginning of August, I know that she did that with some hesitation and that she wanted— they wanted to keep [the child] in their family. But they felt that it would be best for [the child] to have a two parent home and she—I know she visited with those—that foster home and really felt like it was a good fit for him.

Unfortunately, he hasn't been able to be maintained in that home. And I think that they are very skilled foster parents . . . . [The cousin], I know, initially really wanted [the child]. I know that that placement was changed at court to [the aunt]. [The cousin] is committed to keeping him permanently. She—the whole family, essentially, really wants to wrap around this child and does not want to lose him and does not want to make him feel as though he is not wanted. They are committed to him as a family. . . . And I do believe that with services and support, whether that's Early Access, I believe play therapy at some point in time as he gets older. They want to raise him and I—I feel like they are committed to him, and that's what's in his best interest.

. . . .

In the event that he cannot be returned to either parent, [the cousin] is committed to him long term, their family is committed to him long term. I've had in-depth conversations with them.

She has maintained contact with the foster family even while he was in placement. She—they always wanted to be a part of his life.

. . . .

> Because of all the behavioral issues I had to describe in my referral, I'm very concerned that we're not going to be able to find a home. If we do not locate a home by Friday, he would have to go to crisis nursery, and I feel like that would cause him some significant setbacks. And so I believe that placing with relatives in this case is the best for him at this time.
>
> . . . .
>
> [The cousin] has one [six-year-old] child . . . . [O]ne of the concerns [during the prior placement] was that she was working overnights during the week and there's an issue with, you know, who was watching the child. She's now switched her schedule to only be working weekends.
>
> And so, therefore, on the weekends, the plan is for [M.M.] to go with [the aunt] on the weekends. She's going to provide care for him on the weekends, which I thought was actually a really good idea because [the child] already is familiar with her. He's very comfortable with her. And it would also provide the custodian with some sort of respite also.

The DHS worker admitted that one of the issues that led to the aunt's notice was the child's behavioral issues, but the worker believed the placement would be successful this time because "there [had] been no services" provided due to many factors, such as the parents refusal to sign necessary documents and a rotation of service providers. With services, the DHS worker believed the cousin could care for the child. The child's parents, who had made no progress towards reunification since the beginning of the case, consented to the relative placement through their attorneys.

Conversely, the child's guardian ad litem (GAL) did not believe the placement was appropriate, discussing the child's prior placement with the cousin that ultimately led to the placement with the aunt. The GAL explained she had initially agreed with the placement of the child with the aunt because the aunt had indicated to her she "would be that long-term permanent home for [the child,] if necessary" but, that day, "denie[d] that she ever indicated that" and stated "that

she never would have agreed to that because she's fifty and wouldn't want to raise a child again." The GAL did not believe putting the child "back where it didn't work before" was in the child's best interests, noting the aunt had previously indicated that the child "needed to be somewhere else" and "needed a two-parent household." The GAL advised the court she knew of a family that dealt with difficult children that she believed could be a suitable placement for the child.

At that time, the court took the matter under advisement and directed the DHS or the GAL "to contact someone that has more knowledge than this court regarding what a long-term concurrent plan would need to include for a home." The court noted it was bound to place the child in relative care, if possible, but it was "concerned [about] placing this child with a single mom who has her own child and [having] previously found that the aunt was, in essence, a better placement for the child long term than the cousin," and "it was the aunt's opinion that he needs a home where there are two parents available to meet the child's needs," which was not the type of home the DHS was proposing. The court also ordered the DHS to assess the home proposed by the GAL, and it set a status conference for two days later.

At the status conference, the court was advised that the child's mother had "made some threatening statements towards [the cousin, and the cousin did] not feel comfortable . . . having custody of [the child]," but the aunt was now willing to do so. The court asked why the aunt was "now willing to keep the child long-term when a month ago she was not." The DHS worker explained the aunt originally felt ill-prepared and did not feel she had the services necessary to care

for the child appropriately, but the DHS had spoken to the aunt about what services could be potentially provided to her to help her feel more prepared to care for the child. The DHS worker advised the court that a therapist had stated the child "should be placed with a relative over another person or a foster placement where he does not have any sort of attachment. At least he has some attachment with the relatives."

The GAL was against placement with the aunt. She noted the aunt, just two days earlier, denied that she could be a long-term option for the child, and said that "she never would have agreed to that because she's fifty and wouldn't want to raise a child again." The GAL also advised the court that neither the aunt nor the cousin visited the child while he was with the foster family. The GAL also discounted the oral recommendations of the therapist related through other persons because no one knew what the therapist had been told prior to making the recommendation. The GAL stated the home she proposed as a placement has "a long history of providing day care to special needs children, children with reactive attachment disorder and other special needs." The DHS worker and a person from the GAL's office visited the home. The DHS worker stated the home "seemed very appropriate" and "very comfortable working with a child that had behaviors."

The juvenile court rendered a thoughtful ruling from the bench, placing the child in the temporary legal custody of the "other appropriate person[s]" as proposed by the GAL rather than the aunt's custody. The court advised it was "well aware of the statutory requirements that a child be placed with a relative," but it was very concerned that placement with the aunt had already been tried

and was unsuccessful. The court stated that it did not "know that placement with the persons that [the GAL] . . . proposed [was] going to work out," but the court did "know that the placement with [the aunt] already didn't work out." The court did not question the aunt's or cousin's love of the child, but, thinking of the child's best interests in the long term, coupled with the past failed placement, the court found the other home would serve the child's best interests. It did encourage the relatives to maintain contact with the child and that, if this placement did not work out, they might work as a back-up placement option for the child. The court then entered a written order conforming to its oral ruling.

The State now appeals.

## II. Scope and Standards of Review.

"As in all juvenile proceedings, our fundamental concern is the best interests of the child." *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). In making that determination in a CINA case, our review is de novo, requiring us to review the facts and the law then adjudicate rights anew. *See id.* We are not bound by the facts found by the juvenile court, but we do give them weight. *See id.*

## III. Discussion.

The State agrees modification of the disposition order was necessary; it just disagrees with the juvenile court's placement of the child with other suitable persons rather than the aunt. It argues placement with the aunt was "the least restrictive disposition appropriate in the circumstances and would be in the child's best interest." The GAL responds that the juvenile court's choice was the correct one.

It is true that "chapter 232 favors relative placements over nonrelative placements," but its ultimate goal "is to 'best serve the child's welfare.'" *In re N.M.*, 528 N.W.2d 94, 97 (Iowa 1995) (quoting Iowa Code § 232.1 (1993)). We hold no crystal ball, and to some extent, the determination must be made based upon past conduct. Here, the juvenile court found the child's best interests were served by placement with the other persons, rather than the aunt, for numerous reasons, including the outcome of the aunt's prior placement and the aunt's prior statements.

Initially, the aunt told the GAL she could be a long-term placement for the child but later recognized the child needed more assistance than she could provide. She was clearly considering the child's best interests in finding a more suitable placement for the child. The fact that the first foster home did not work out does not mean returning the child to the care of the aunt was required, particularly considering she already stated she could not give the child what he needed and she had not seen the child since he was removed from her home. She was not even the first placement option when the DHS learned the foster family would not work out, her daughter—the cousin—was. At the first day of the status hearing, placement with the cousin was considered everyone's preference but for the GAL. There was nothing at that time indicating the aunt could and was willing to care for the child in the long term. Rather, it was understood she would be providing limited care when the cousin could not. Two days later, after the cousin had changed her mind due to threats from the mother, suddenly all involved, but the GAL, felt it was the aunt who was the best potential long-term provider. Even considering the provision of additional services to the aunt, under

this record, we find no reason to disturb the juvenile court's thoughtful decision. Accordingly, we affirm the juvenile court's order placing the child in the care of other suitable persons.

**AFFIRMED.**